Cecil **D. KAUFMANN** and Isabelle **G.**
Kaufmann, in their own right and to the
use and benefit of Liberty Mutual Fire
Insurance Company, et al., Appellants,

v.

GRIFFITH–CONSUMERS COMPANY,
a corporation, Appellee.

No. 6952.

United States Court of Appeals
Fourth Circuit.

Argued April 19, 1955.

Decided May 13, 1955.

Armistead L. Boothe, Alexandria, Va.
(Boothe, Dudley, Koontz & Boothe, Alexandria, Va., Albert F. Beasley, Washington, D. C., Simon Hirshman, Washington, D. C., and Henry B. Crockett, Alexandria, Va., on brief), for appellants.

Edmund D. Campbell, Washington, D. C., and Frank L. Ball, Arlington, Va., for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This suit was brought by the owners of a large apartment house in Alexandria, Virginia, against a corporation which had contracted to convert the heating and hot water system of the building from coal to oil. Before the contractor's work was completed one of the three boilers, which formed part of the system, exploded shattering adjacent structures and causing personal injuries and property damage to tenants and other persons. Thirteen suits for damages were filed against the owners and the contractor. The owners do not deny liability but they blame the disaster on the contractor and seek in this suit to recover from the contractor the loss they have directly sustained and also indemnity for any liability which may be fastened upon them for the loss suffered by the other injured parties. The contractor counterclaimed for the balance due on the contract price amounting to $7,000.

The District Court consolidated all of the suits and the parties waived a jury trial on the question of liability but reserved the right of a jury to fix the amount of the damages. All the parties were represented in the trial in the Dis-

trict Court, but the hearing was confined in large measure to the charges of the owners against the contractor and its countercharges against them. After an extended hearing the District Judge made findings of fact and reached the conclusion that the sole and proximate cause of the explosion was the negligent act of an employee of the owners, and that no fault could be laid to the contractor or the sub-contractors engaged in the work of conversion. The complaint of the owners against the contractor was dismissed and judgment was entered in favor of the contractor on its counterclaim in the sum of $7,000.

The accident happened at 3:45 P. M. on August 27, 1952 when Boiler No. 1, the smallest of the three boilers, exploded. This was the only boiler kept in active service during the work of conversion in order to supply hot water to the tenants. The explosion was caused by the act of Henry Anderson, the janitor of the apartments, who sealed the boiler by closing all of the valves by which water entered and flowed from the boiler, but left a fire burning under it. The valves were closed about 10 A. M. and the boiler blew up in the afternoon, a few minutes after Anderson and one Howard Snyder, an employee of the sub-contractor who did the electrical work, had left the boiler room. The crucial question in the case is whether the dangerous condition in which the boiler was left was due to the negligence of Anderson, the representative of the owners, or to Rudolph L. Schmitz, the sub-contractor who actually did the work of converting the boilers, or to the negligence of both of them.

At the time of the accident no work had been done on No. 1 boiler, but the contractor was about ready to begin the work of installation. On No. 2 boiler the installation work was finished and the electrician had completed part of his work. The installation and electrical work on No. 3 boiler had been completed on the day before and it had been filled with water. It remained only for the electrician, the sub-contractor of Schmitz, to make the final connections on the morning of the accident. This was done and the burner under the boiler was ignited between 9:30 and 10 A. M., and when the water was heated, Schmitz told Anderson to "Cut in No. 3" or "open the valves". As to No. 1 the instruction was "to kill it", or to cut or shut off the switch by which the stoker under No. 1 was brought into operation. Schmitz also requested Anderson to leave a fire under No. 1, so as to recall it to service in case No. 3 burner did not function successfully. The witnesses differ as to the exact words used by Schmitz, but it is not disputed that all parties understood that the purpose was to put Boiler No. 3 into service and to retain No. 1 in such condition that it could be used promptly in case Boiler No. 3 failed to function.

Accordingly, Anderson climbed a ladder to reach the supply valve on the top of Boiler No. 3, through which water flowed to the apartments, and opened the valve. He then descended and went to the rear of Boiler No. 3 and opened its return valve, and thus Boiler No. 3 was put "on the line." He then took the following steps with regard to Boiler No. 1. He cut the switch, thereby shutting off all electric power to the stoker, and then unknown to Schmitz or the other men present, he shut off both the supply and return valves to No. 1; and he left the fire burning under the boiler. It was his own idea to close the supply and return valves on Boiler No. 1. He was not told· to do so by Schmitz, and both Schmitz and the men with him who were working on Boiler No. 3 were so placed that they did not see Anderson close the valves, and they did not know that he had done so.

■ The evidence fully sustains the finding of the District Judge that the owners were guilty of negligence. He found not only that Anderson was incompetent and had no idea that he had put Boiler No. 1 in a fair way to explode, but also that the safety valves on top of the boiler were not only inadequate but were rusted and "frozen" so that they would

not operate. On these points the judge said

"Initial and activating carelessness was Anderson's closing the supply and return valves of No. 1 with the water above 180° F. (the set of the aquastat) and with a live fire in the box. Schmitz may have told him not to rake out the coals, but this direction was made on the premise that the valves were open. It was exclusively Anderson's idea that prompted the valve-closing. With him it was normal procedure. He had been trained to do it; had done it before; and he was furnished with tools for the purpose. Schmitz's words to him, taken as retold by Anderson, conveyed no such instruction. Clearly they sought only a discontinuance of the stoker operation.

\* \* \* \* \* \*

"Negligence of the owners is found too, in the delegation of so great a responsibility to one of Anderson's competence. Employed as a gardener in May, 1951 and later becoming a handyman about the Apartments, he shortly was promoted to janitor. With three men under him, by 1952 he had the duty of operating the heating plant for the whole project, though he was illiterate, without education of any kind and with previous experience consisting only of firing boilers by hand in a tobacco factory. His incapabilities were the subject of repeated complaints by the mechanic regularly employed to repair the heating equipment.

"Anderson's ignorance proved critical. It permitted to pass unnoticed an obvious flag of the impending danger, just two hours before the blast. In ascertaining if a sump pump connection was intact, Anderson or the electrician turned on the switch to No. 1 stoker at about 2 o'clock. The stoker did not respond. The electrician then tripped the switch or relay on the stoker and the motor came on for a few seconds, disclosing electricity at the stoker.

The immediate cessation of the motor, though current was available, conclusively indicated that the boiler temperature was equal to or beyond the aquastat's check, notwithstanding the stoker supposedly had been idle for four hours. Even the electrician, untrained in boiler matters, remarked upon this possibility, but it was beyond the comprehension of Anderson.

"No. 1's safety value evidences most sharply the air of carelessness prevailing in the boiler room. When new, the boiler had a rated strength of 30 pounds for water pressure. Yet the safety valve was set for 75 or 80 pounds. Hence though the safe boiler-pressure should be doubled and more, the valve could not open. The boiler with the valve was installed in 1942, the year the Apartments were built. It may be that this type of valve was then in general use, as argued by the owners. Nevertheless this valve had long since been considered unprotective, certainly for many years following the owners' acquisition in 1946, and yet no substitution had been made. Likewise, inadequacy in the size of the instant valve—¾ inch—had been known for several years. As a matter of fact, no inspection or testing of the safety valve is proved ever to have been made. 'Poor housekeeping' was how the repair mechanic described the boiler maintenance there.

"The safety valve deficiency was not compensated by the engineering safety factor of boilers. Perhaps the boiler had prescribed boiler strength—four or five times its rating—giving a resistance of 120 or 150 pounds. Yet pressures in No. 1 mounted to more than 200 pounds, the boiler ruptured throughout, but the valve held fast."

In an endeavor to counter this impressive showing the owners set up first and foremost the contention that in opening the valves on Boiler No. 3 and closing

them on Boiler No. 1, Anderson was acting for and in obedience to the contractor, since the work involved the substitution of Boiler No. 3, which had been completely converted, for Boiler No. 1 which remained to be changed. Therefore it is said that the contractor is solely responsible for what Anderson did. The facts, as the District Judge correctly found, are to the contrary. Throughout the conversion Anderson was in charge of the boiler room for the owner and retained control of Boiler No. 1 in order to serve the tenants. This service, involving the manipulation of the valves and of the stoker switch, was clearly within the scope of his regular service and he took no orders from the contractors in regard thereto. He was in no sense the servant or agent of the contractor. When the time came to take over Boiler No. 3, which had been finished, and to turn over Boiler No. 1 to the contractor for conversion, Anderson was on hand for this purpose on behalf of the owners. The withdrawal of No. 1 from service was no part of the work of conversion. It was the sort of thing he was called on to perform in the execution of his regular work and the contractor had every reason to believe that he was competent to do it and no knowledge or reason to suspect that he had done it improperly on this occasion.

Next, the owners contend that the contracting corporation was responsible because it did not obtain a permit for the conversion in the manner required by the City Ordinance of Alexandria. The contractor made an application for a permit but did not complete the application entirely since he gave no information in answer to inquiries as to the safety valves on the boilers, which in fact the contractor did not inspect. The contention seems to be that if the safety valves had been examined, the accident would not have happened. We approve the finding of the District Judge that the point is too remote to be considered pertinent to the explosion. The evidence indicated that the inquiry in the application as to safety valves was

to be answered only in original installations; and this seems to have been correct, for the permit was actually issued as to Boilers 2 and 3. The contract of conversion did not contemplate any alteration of the safety valve or responsibility therefor. The whole purpose was to substitute one kind of fuel for another. Moreover, no permit for Boiler No. 1 was ever passed upon or issued, since the conversion of No. 1 was never begun. Under these circumstances there was no causal connection between the omission in the applications for permits in regard to Boilers 2 and 3 and the explosion of Boiler No. 1.

Finding no error in the conclusions of the District Judge, the judgment is

Affirmed.